## NATIONAL LABOR RELATIONS BOARD v. STANDARD OIL CO.

### No. 11464.

United States Court of Appeals
Sixth Circuit.

June 6, 1952.

Marcel Mallet-Prevost, Washington, D. C., George J. Bott, David P. Findling, A. Norman Somers, Marcel Mallet-Prevost, William J. Avrutis, Washington, D. C., on brief, for petitioner.

James R. Tritschler, Cleveland, Ohio, Maurice F. Hanning, James R. Tritschler, Cleveland Ohio, on brief; McAfee, Grossman, Taplin, Hanning, Newcomer & Hazlett, Cleveland, Ohio, of counsel, for respondent.

Before SIMONS, Chief Judge, and McALLISTER and MILLER, Circuit Judges.

MILLER, Circuit Judge.

The National Labor Relations Board has petitioned the Court for enforcement of its order of November 27, 1950 issued against The Standard Oil Company, an Ohio Corporation, Respondent herein. § 160(e), Title 29 U.S.Code Annotated.

The Respondent has approximately 10,500 employees, of whom about 325 are employed at its Toledo Refinery. On April 3, 1943, the Board, after an employee election, cer-

tified Local 346 of the Oil Workers International Union (CIO) as the exclusive bargaining representative of the Respondent's employees in an appropriate unit at the Toledo Refinery. The Respondent recognized the Union and, on July 29, 1943, entered into a collective bargaining agreement setting forth the terms and conditions of employment. Successive agreements were thereafter negotiated and executed on a number of occasions.

In 1928, the Respondent had instituted the "Sohio Plan for Employee Group Life and Total Permanent Disability Insurance," the benefits of which were made available to employees of the Company generally. The plan contained a provision whereunder the Company reserved the right to modify it upon proper notice to its employees, and from time to time the provisions of the plan were modified.

In January, 1948, negotiations were entered into looking to a new collective bargaining agreement to replace the one expiring February 18, 1948. Among the Union proposals was a request that the Respondent pay the full premium for coverage of employees after retirement, and also a request that the Respondent agree to a non-discrimination clause which would provide that the Respondent would not discriminate against employees covered by the agreement with respect to benefits provided for employees generally. The Respondent refused to accept the Union's proposal that it pay the full premium for insurance coverage of employees after retirement, but did agree to a non-discrimination clause. The executed contract, effective October 11, 1948 and covering a period of two years, contained the following provision—"The Company shall not discriminate against employees covered by this agreement with regard to participation in benefits or bonuses provided for employees of The Standard Oil Company (Ohio)."

In the middle of 1949, following several years study of the plan, the Respondent concluded that the cost of continuing the existing coverage of annuitants would become prohibitive. On October 27, 1949, without previous consultation with its employees, the Respondent presented to the Local's Workmen's Committee several amendments to the plan to become effective on January 1, 1950. Following objections to the proposed amendments and some correspondence in the matter, a meeting was held on January 16, 1950, at which the Committee objected to the Respondent's having made the changes in the plan without consulting the Union, expressed its desire to negotiate, and asked whether the Respondent regarded the matter as "negotiable." The Respondent's representatives answered that they considered group insurance a "negotiable" subject, but since the Respondent negotiated with the Union on the plan in entering into the 1948 contract the plan was not open again for negotiations until fall when the collective bargaining agreement expired. They also took the position that under the non-discrimination clause of the 1948 contract the Respondent was obligated to put the amendments into effect for the employees in the bargaining unit on January 1st, and that failure to do so would be a violation of the contract.

Following a charge filed with the Board on February 3, 1950, the complaint issued on April 26, 1950. The Board found that the Respondent refused to bargain collectively with the Union with respect to its Sohio Plan in violation of § 8(a), (1) and (5) of the Act, § 158(a) (1) and (5), Title 29, U.S.C.A. Its order provided that the Respondent cease and desist from (1) refusing to bargain collectively with the Union, (2) making any unilateral changes in its Sohio Plan affecting Union employees without prior consultation with the Union, and to take the following affirmative action: (a) upon request bargain collectively with respect to its Sohio Plan, (b) consult with the Union prior to taking any action which would affect Union employees with respect to the terms and provisions of its Sohio Plan, (c) post appropriate notices, and (d) notify the regional director of the steps taken.

The Respondent contended before the Board and contends here that under the terms of the non-discrimination clause of the 1948 agreement the Union waived its right to bargain with respect to amendments to the Group Insurance Plan for the

duration of the agreement. It also contends that its conduct was not in violation of the Act because the Union failed to use the grievance and arbitration procedure set forth in the contract, in connection with the refusal to bargain about the Group Insurance Plan. Both of these defenses were overruled by the Board

We will discuss the second issue only, inasmuch as our ruling on it renders unnecessary a ruling at the present time on the question of waiver.

Article VIII of the contract of October 11, 1948 deals with "Workers Representation and Methods of Settling Disputes." Section 1 of the article provides for the selection of "Bargaining and Grievance Committees" by the employees. Section 5 deals with "Grievance Procedure." The opening sentence reads as follows: "For the purpose of adjusting complaints or grievances which may arise, the procedure herein outlined will be followed." The procedure outlined is briefly as follows: Upon the existence of a complaint or grievance the employee first seeks adjustment with the foreman. In the event satisfaction is not received, the complaint or grievance may then be turned over to the Workmen's Committee which shall submit the complaint or grievance in writing to the plant manager for further consideration. The plant manager investigates the complaint or grievance and discusses it with the Grievance Committee at the regular monthly meeting. If the plant manager's decision is not acceptable the Grievance Committee and the Home Office Management of the Company meet to further discuss the complaint or grievance. It then provides "Upon failure to reach a satisfactory settlement * * * the dispute may be submitted to arbitration provided the complaint or grievance is an alleged violation of the provisions of this agreement or an interpretation of it or a supplement to it. The parties shall then attempt to agree on a method of arbitration. * * *" Procedure is then provided for the selection of an arbitrator to hear and decide the dispute. It further provides "The arbitration award shall be final and binding on both parties." It is un-

disputed that the foregoing procedure was not followed.

■ Respondent relies upon the decision of this Court in Timken Roller Bearing Co. v. N.L.R.B., 6 Cir., 161 F.2d 949, 956, as requiring such grievance procedure to be followed, and as holding that insistence by management upon such procedure being followed is not a refusal to bargain or an unfair labor practice under the provisions of the Act. In that case the bargaining contract contained a section devoted to "Adjustment of Grievances" which set up detailed procedure for such adjustments in four steps, and provided that any grievance or dispute involving the interpretation or application of the contract not thereby adjusted should be submitted to arbitration. Management and the Union disagreed over the meaning of a paragraph of the contract with respect to sub-contracting work on the part of management. Management refused to bargain on the issue. In a proceeding before the Board, the Board ruled that the Company had refused to bargain and issued its cease and desist order commanding the Company to refrain from unfair labor practices in so refusing to bargain. The Company petitioned to have the order set aside contending that it was not an unfair labor practice for an employer with a bargaining agreement with his employees, which contained provisions for adjustment of grievances, to stand upon the terms of the bargain and demand that grievances be handled within the framework of the contract. The Board contended that there was a continuous statutory obligation to bargain which existed independently of all contractual obligations. This Court held that though the duty to bargain is absolute, it may be channeled and directed by contractual agreement; that we knew of no mandate of the law that required bargaining to be undertaken and pursued in a particularized manner excluding every other; and that under the contract between the parties their differences were to be resolved in the manner therein outlined. After reviewing the purposes of the Act, we stated "Our conclusion is that the petitioner did not commit any unfair labor practice; that its

effort to channel collective bargaining within the provisions of a contract with the union, was not a refusal to bargain; * * *." We granted the petition to set aside the Board's order.

 Petitioner attempts to distinguish that case from the present controversy by pointing out that in the Timken Roller Bearing Co. case the Union was required by its contractual agreement to process its "difference" with the employer through the grievance and arbitration procedure because its contract referred to "differences" as well as to "grievances," while in the present case the contract referred to "complaints or grievances," which phrase did not include the matter in controversy in this case. However, we said in the Timken Roller Bearing Co. case, "we do not view the term 'grievances' as a term of art having a connotation differing from its meaning in ordinary use." Although the grievance procedure in the present case referred to "complaints or grievances," it will be noticed that the contract used the broader term "dispute" in providing that upon a final failure to reach a satisfactory settlement "the dispute may be submitted to arbitration." It also provided for such procedure if "the complaint or grievance is an alleged violation of the provisions of this agreement or an interpretation of it." In our opinion, the controversy in the present case is a complaint or a dispute and involves both the questions of a violation of the terms of the agreement and an interpretation of it.

 Petitioner also contends that the grievance procedure was designed to cover merely the familiar personal grievance of the individual employee and did not cover broad questions of contract interpretation directly affecting all employees covered by the contract, such as the dispute as to the meaning of the non-discrimination clause. It is susceptible to that interpretation. But Section 5 is not by its terms restricted to individual complaints. The procedure outlined is "For the purpose of adjusting complaints or grievances which may arise." If questions of a general nature were not included it would have been very easy to have

so provided. Article IX does in fact exclude certain controversial matters from the grievance procedure, but apparently not a controversy of the present nature. Respondent offered to prove that under the grievance procedure the Company and the Union handled grievances of a general nature that would be applicable to all employees covered by the bargaining unit as well as grievances pertaining solely to individual employees. This offer of proof was rejected by the Examiner. We think it should have been received as showing the construction placed upon the contract by the contracting parties. Franklin Fire Ins. Co. v. C. & O. Ry. Co., 6 Cir., 140 F.2d 898; Begnaud v. White, 6 Cir., 170 F.2d 323, 325–326. In Brooklyn Insurance Co. v. Dutcher, 95 U.S. 269, at page 273, 24 L.Ed. 410, it was said: "There is no surer way to find out what parties meant than to see what they have done." The parties should have the opportunity of fully developing this phase of the case.

The action is remanded to the Board for further proceedings consistent herewith.